# Jones *v.* Jones, Appellant.

*Trusts and trustees—Existence of trust—Evidence—Sufficiency.*

In a suit in equity for a declaration that plaintiff was the beneficial owner of an undivided one-fifth interest in a tract of land and for an accounting for plaintiff's share of the profits, it appeared that defendant's devisor had held the legal title, and that he had executed a declaration of trust in favor of five persons under one of whom plaintiff claimed, that for a time one-fifth of the rents had been paid to plaintiff by defendant and that the declaration of trust had been on several occasions admitted by defendant to be in their possession. The lower court awarded the relief prayed for. *Held,* no error.

Argued Jan. 31, 1916. Appeal, No. 71, Jan. T., 1915, by defendants, from decree of C. P. Montgomery Co., March T., 1913, No. 2, in equity, on bill in equity for discovery and for declaration of trust in case of Emma C. Jones v. Esther Jones and Hannah Emma Jones. Before BROWN, C. J., POTTER, STEWART, FRAZER and WALLING, JJ. Affirmed.

Bill in equity for discovery and declaration of trust.

SWARTZ, P. J., filed the following findings of fact and conclusions of law:

The plaintiff, Emma C. Jones, filed her bill alleging that one Jonathan Jones held in trust certain real estate situate in the Borough of Norristown, and that she is the owner of the undivided one-fifth of said property under a declaration of trust by the said Jonathan Jones, and that the defendants each own an undivided two-fifths in said real estate. The bill prays for a discovery of the declaration of trust and for a decree fixing her one-fifth interest in said property.

### FINDINGS OF FACTS.

1. David Jones was the owner of two properties situate in the Borough of Norristown. He died testate, on

February 26, 1879. He devised his estate to his wife for life, and after her death to his eight children. One of the said children, Elizabeth, died intestate and without issue. The real estate vested in the seven children, Thomas C., Elias H., Chalkley, Jonathan, Mary Ann, Esther and Hannah Emma. Mary Ann died and her share passed to her two children, Horace G. White and A. Laura White.

2. Letters of administration c. t. a. were granted to Thomas C. Jones, Chalkley Jones and Esther Jones. In September, 1880, a petition was presented to the Orphans' Court for an order to sell the real estate for the payment of debts. The order was awarded for the sale of the two properties, being all the real estate owned by the testator. No. 1 was located at the west corner of Main and Barbadoes streets, and was used as a wholesale liquor store. The second story was occupied as a dwelling. This is the property now in controversy. No. 2 was an adjoining tract. The administrators sold No. 2 for $3,200. No. 1 was not sold and the order of sale was continued as to that property.

3. The original petition for the sale is lost, and the record fails to show the schedule of debts. The records in the recorder's office, however, show that No. 1 was subject to a mortgage of $4,500. This mortgage was satisfied on May 9, 1882. The sale of No. 2 was made on April 6, 1882.

4. The administrators filed a petition for leave to mortgage No. 1. The application alleged that the proceeds of the sale of No. 2 were not sufficient to pay the debts. A mortgage for $2,500 was placed on the property under the order of the court. The mortgage is dated May 1, 1882.

5. On the 24th day of December, 1887, the administrators, under the continued order of sale, sold tract No. 1 at public sale, to Jonathan Jones, one of the said seven children, for the sum of $3,500, subject to the said mortgage of $2,500 created by leave of court.

6. The deed was made by the administrators, on the 25th day of February, 1888. The deed was in the usual form where administrators sell for the payment of debts. It was made subject to the mortgage of $2,500, and contained a receipt for the full purchase-money of $3,500. It also contained the ordinary covenant, that the administrators had not done or committed any act, matter or thing whatsoever, whereby the premises are charged or encumbered in title, charge or estate.

7. The administrators collected the rents from April 1, 1879, to March 1, 1888. According to their account filed, June 4, 1888, the aggregate rents collected amounted to $3,305.03. Credit is taken for these rents, in the account filed, as paid out by the administrators. This account is so incomplete and incomprehensible that little information is furnished by it. It does appear, however, that the administrators charged themselves with the proceeds of the sale of tract No. 1, to-wit: $3,-500. But on the credit side there is an item of $3,197.78, "credit out of proceeds of real estate, tract No. 1, sold by order of the Orphans' Court."

When this account was filed, it is evident that Jonathan Jones had paid, if anything, only $300.00 of the purchase-money for tract No. 1.. The account does attempt to strike a balance due by the administrators amounting to $2,576.00. There is no charge for the money received by the accountants from the mortgage of $2,500.00. Nor is there any credit taken for the payment of the mortgage of $4,500.00. The proceeds of tract No. 2 and the mortgage of $2,500.00 amount to $5,700.00 less expenses. The debts paid, including commissions and counsel fees, as per the account, aggregate about $1,000.00. The payment of these debts and the satisfaction of the mortgage of $4,500.00, would exhaust the $5,700.00. That the moneys were so applied is apparent when we note the dates of the receipts of the $5,700.00 and the date of the satisfaction of the mortgage of $4,-500.00.

8. From this computation it is apparent that the net estate for the devisees of David Jones was something less than the value of tract No. 1, subject to the mortgage of $2,500.00. The account fixes this net amount of the estate at $2,576.00, and the confirmation was made more than twenty-four years before the plaintiff's bill was filed. Two of the seven heirs received one-seventh of this sum, or $368.00, and gave their releases for full payment to them. This ended their interest in the estate, and whether the amounts so paid were correct or only approximately correct, is immaterial.

9. So far as there is any evidence before us, no one of the other legatees ever received one dollar out of the corpus of the estate. That rents received from tract No. 1 were paid to the five legatees or applied for their benefit by Jonathan Jones, is evidenced by written and oral proofs.

10. That Jonathan Jones did not pay more than $100.00 or at most $300.00 of the purchase-money for tract No. 1, is established by the evidence. This is shown by the account filed by the administrators, where credit is taken for $3,200.00. This account was filed more than three months after the deed was made to Jonathan Jones, wherein the receipt of the $3,500.00 is acknowledged. The judgment note for $3,400.00 by Jonathan Jones to the administrators remained unpaid, at the time of this equity hearing. At least, the production of the paper by the "girls,"—that is—Esther and Hannah Emma, does not prove payment of the note. Esther was one of the administrators and the proper custodian of the note if unpaid. Counsel for the said defendants produced the various receipts and papers with the statement—"I went to see them and they gave me all the papers I could get hold of. These are all that I received." At the hearing no one appeared for the estate of Jonathan Jones.

11. Jonathan Jones paid to two of the legatees their respective shares in the estate of David Jones, as ascertained by the account filed. These payments were com-

pleted as late as June, 1895. If he paid for tract No. 1 he was in no way indebted to any legatee for his distributive share in the estate of David Jones.

12. He charged Chalkley Jones and later his widow, the plaintiff, for costs of maintenance, interest and other expenses incurred in managing the property known as tract No. 1, and accounted to them for one-fifth of the net rents collected. These acts are entirely inconsistent with any claim that he was the sole owner of the said property.

13. The receipts given by Jonathan Jones and especially the one signed by Jonathan Jones and Esther Jones, show conclusively these settlements for rents collected, and also declare in clear language, that tract No. 1 is owned in equal shares by the five heirs, Chalkley, Jonathan, Thomas, Esther and Hannah Emma, the other two shares having been paid off.

14. The will of Thomas Jones declares:—"The real estate of which I hold a one-fifth part is located in the Borough of Norristown, State of Pennsylvania, on the corner of Main and Barbadoes streets, in the Borough of Norristown, and is held in fee by my brother Jonathan Jones, for the benefit and direction of the other four heirs......" While this is a declaration in favor of his interest, still, as the two defendants received the one-fifth share by the will of the said Thomas, they are not in a position to deny that they received such title just as it was devised to them.

15. At the time Jonathan Jones took title under Orphans' Court sale, a declaration of trust was prepared by Mr. Jenkins, an attorney who occupied a room next to that of the counsel for the David Jones estate. The writing was a declaration by Jonathan Jones that he held the property in trust for the heirs. Mr. Jenkins remembers that one of the heirs who wanted his money was Elias H. Jones, and that he was paid. Jonathan Jones was not present and the witness does not know whether the paper was signed by Jonathan.

16. J. Wilford Jones on numerous occasions received from Jonathan Jones the one-fifth share of the rents collected for tract No. 1, to be handed over to Chalkley Jones, the father of the witness. He received like collections for his mother, after the father's death. Jonathan Jones would explain to the witness that the share was small, at times, because of deductions for taxes. On one or more occasions the said Jonathan Jones said that he had made a declaration of trust, showing who the different owners were, and that the paper was held by Esther and that she had deposited the same in a safety vault at bank. We find the facts, as testified to by this witness.

17. E. Linda Jones, a daughter of the plaintiff, had numerous interviews with the defendants, Esther and Hannah Emma, about the "secret trust." Both defendants stated that there was a trust paper and that Esther had the paper with the trust company. They also explained that the paper declared that Jonathan held the property in trust for the five heirs, that the paper showed that each one held one-fifth of the property. She also testified that she was frequently present when Jonathan paid the rent to her father, and that the same varied. Sometimes they were paid as much as $13.00 per month. At other times it was explained in her presence that nothing could be paid because the interest due on the mortgage and other expenses consumed the rent. We so find the facts.

18. After Jonathan Jones' death the net one-fifth share of the rent was paid to the plaintiff by the defendant, Hannah Emma. These payments were made from 1911 to April 1, 1912.

19. Jonathan Jones paid off the shares of Elias and the children of Mary Ann White, out of the income of the property. This is evidenced by the receipts and the declaration of the defendants themselves. He began payments to Elias as early as October, 1888. The first payment to Horace G. White was apparently made in

May, 1889, and all payments for the two shares were completed in June, 1895. He then commenced to reduce the $2,500.00 mortgage. He paid $500.00 in October, 1895, and $500.00 more in October, 1897. The net proceeds of the rents for two years would be ample to meet a payment of $500.00. The annual rent at this period, for the liquor store alone, was about $540.00. These findings may show that the two legatees were paid their shares in part, out of the income of their own property. But as we do not understand the account filed by the administrators, and as these legatees are satisfied and gave their releases, any further inquiry is immaterial.

20. We, therefore, find that the five legatees named were the beneficial owners of tract No. 1. On February 25, 1888, although the legal title was placed in one of their number, Jonathan Jones, that it was the declared intent, purpose and understanding that he should hold the property in equal shares for five legatees, notwithstanding the Orphans' Court sale, and that Jonathan Jones should account to the said five legatees for the net income from the property until sold, and sell the same whenever a price acceptable to the parties could be realized, and account to them for the proceeds.

21. We also find that there was a written declaration of trust by the said Jonathan Jones, delivered to Esther Jones, and held by her, setting forth, in effect, the trust as set forth in our finding No. 20.

22. There was no evidence submitted by the defendants, denying any of the proofs offered by the plaintiff, relating to the distribution of the rents. Nor was there any explanation or denial of the receipts produced by the plaintiff, or of the written declarations therein made. The defendants offered no denial of the alleged statements made by them, that there was an existing declaration of trust in their custody, except so far as such averments are denied by the answer.

23. J. Wilford Jones and E. Linda Jones, children of Chalkley Jones, deceased, assigned their interest in the

estate of their father to their mother, the said plaintiff. This transfer was made as early as January, 1905, long before there was any controversy between the parties to this bill, and before there was any intimation that the defendants would deny the title of Chalkley Jones to a one-fifth interest in the property. The assignment was made in good faith in love and affection for their mother, and with no thought that they were qualifying themselves as witnesses in the present controversy. The subsequent deed was made to put in legal form the transfer that was made in fact more than six years before.

CONCLUSIONS OF LAW.

1. J. Wilford Jones and his sister, E. Linda Jones, are competent witnesses for the plaintiff:

(a) Their interests in the property in question were released to the mother in good faith long· before any controversy over the property rights arose or was in contemplation.

(b) They are not attempting to impeach any conveyance of the father's property. He sold not his own title, but, as one of the administrators, united in a deed conveying the title of David Jones, deceased.

(c) They do not attack the deed, but admit that it shall stand. They contend that the grantee by a declaration of trust at the time, fixed the rights of the parties to the property.

2. The statute of limitations cannot defeat the plaintiff's claim, if, as we find, there is a specific written declaration of trust; especially so as the claimant was in constructive possession of the trust property for all these years, by receiving from the trustee her one-fifth share of the rents. The defeasance Act of June 8, 1881, P. L. 84, has no application to the facts in this case. There is no attempt to convert a deed into a mortgage.

3. Even if the evidence shows no more than a trust by parol, the papers signed by Jonathan Jones are suf-

ficient to bring the case within the requirements of the 6th Section of the Act of April 22, 1856, P. L. 532, and the payment of the rents to the plaintiff put her in constructive possession of the property, and the limitation of five years under the Act of 1856 has no application.

4. The executors of Jonathan Jones were not made a party to the bill, but his interests in the property, by his will, passed to the defendants. If as trustee he made any advances to carry out the arrangement to hold the property for himself and his brothers and sisters, we must assume, in the absence of an account by his executors, and under the proofs that for more than twenty years he collected large sums of rents and made payments and distributions of the said collection, that he reimbursed himself for advances by him, if any were so made.

5. The plaintiff is entitled to a decree, in her favor, that she is the beneficial owner in fee of the undivided one-fifth part of the property situate at the west corner of Main and Barbadoes streets, and fully described in her bill of complaint, that she is entitled to the one-fifth net proceeds of the sale, and to the one-fifth net income of said property until the same shall be sold by a trustee to be appointed by the court, to succeed the said Jonathan Jones, the deceased trustee, the costs to be paid by the defendants.

6. As Esther Jones and Hanna Emma Jones leased the property, so far at least as the liquor store is concerned, they must account to the plaintiff for one-fifth of the net rents from April 1, 1913, the date when their lease began. There is no sufficient evidence before us to order an accounting back of the date named,—April 1, 1913.

The lower court decreed that plaintiff was the beneficial owner in fee of an undivided one-fifth part of the property in question, that she was entitled to a one-fifth of the net proceeds, upon the sale of said property, and to a one-fifth of the net income, until a sale of said prop-

erty was effected by the trustee appointed by the court. Defendants appealed.

*Error assigned,* among others, was the decree of the court.

*Nicholas H. Larzelere,* with him *Ephraim F. Slough* and *H. Legrand Ensign,* for appellants.

*Montgomery Evans,* with him *Aaron S. Swartz, Jr., John M. Dettra* and *Samuel H. High,* for appellee.

PER CURIAM, March 6, 1916:

This decree is affirmed, at the cost of the appellants, on the facts found by the learned chancellor below upon competent and sufficient evidence.

---

# Wolfe *v.* Smith, Receiver of Pittsburgh, Shawmut & Northern Railroad Company, Appellant.

*Negligence—Railroads — Passengers — Platforms — Absence of guard rail—Case for jury.*

In an action against a railroad company to recover damages for personal injuries sustained by plaintiff in consequence of a fall from a platform at one of defendant's stations while waiting for a train, the case is for the jury and a verdict for the plaintiff will be sustained where it appeared that plaintiff miscalculated the distance of the platform from the ground and in stepping therefrom fell into a ditch, that the night was dark and there was no guard rail at the end of the platform where the accident occurred.

Submitted Feb. 1, 1916.　Appeal, No. 1, Oct. 1, 1916, by defendant, from judgment of C. P. Armstrong Co., Sept. T., 1914, No. 19, on verdict for plaintiff, in case of Mary P. Wolfe v. Frank Sullivan Smith, Receiver of the Pittsburgh, Shawmut & Northern Railroad Company, a Corporation.　Before BROWN, C. J., POTTER, STEWART, FRAZER and WALLING, JJ.　Affirmed.